CARDINAL FREIGHT CARRIERS, INC., *et al. v.*
J.B. HUNT TRANSPORT SERVICES, INC., and
J.B. Hunt Logistics, Inc.

98-917                                          987 S.W.2d 642

Supreme Court of Arkansas
Opinion delivered January 28, 1999

*Morris, Manning & Martin, L.L.P.*, by: *Jefferson D. Kirby III* and *Ann R. Schildhammer* and *Conner & Winters, P.L.L.C.*, by: *John R. Elrod* and *Ruth Ann Wisener*, for appellants.

*Shemin Law Firm*, by: *Kenneth R. Shemin* and *Bassett Law Firm*, by: *Woody Bassett*, for appellees.

Tom Glaze, Justice. This case involves a significant issue regarding the construction of the Arkansas Trade Secrets Act, compiled in Ark. Code Ann. §§ 4-75-601—4-75-607 (Repl. 1996). This litigation arises out of a controversy over a confidential agreement that a number of managerial or key employees, appellant-employees herein, signed when going to work with appellees J.B. Hunt Transport Services, Inc. and J.B. Hunt Logis-

tics, Inc. (hereafter referred to as Hunt). The confidential agreement did not include a non-competition provision.

In 1991, appellant Thomas Hostetler was hired by Hunt to build its dedicated contract services division, which was to provide customized transportation and distribution systems for companies that outsource private trucking fleets. Appellant Vincent McLoughlin and other appellant-employees had been hired by Hunt directly from Ryder, a Hunt competitor. McLoughlin and Hostetler were responsible for building the new division, which turned out to be successful. Hostetler and McLoughlin were offered and given a bonus plan when they went to work with Hunt, but that plan was subsequently terminated in 1995. An alternate bonus plan was offered by Hunt, but the new plan did not satisfy the appellants. In July of 1997, appellant-employees resigned their jobs with Hunt and accepted employment with appellants Cardinal Freight Carriers and Cardinal Logistics Management, Inc. (hereafter Cardinal).

In September 1997, Hunt filed suit in chancery court, seeking injunctive relief and claiming the appellants had violated the Arkansas Trade Secrets Act. Hunt asserted that it had been irreparably damaged, that it had no adequate remedy at law, and that the appellants' use of Hunt's confidential information would affect the goodwill of its customers and its goodwill in the marketplace generally. The chancellor found that Hunt had a valid interest protected by its confidential agreement and that Cardinal had no compunction against using or disclosing such confidential information to gain an unfair competitive advantage. The chancellor enjoined Cardinal and the other appellants from conducting any new business with four of Hunt's customers — Home Depot, Office Depot, Georgia Pacific, and Auto Zone. The injunction expired on July 15, 1998, one year after the appellants, former Hunt employees, resigned and went to work for Cardinal. Appellants raise four points for reversal.

Appellants first contend the chancellor wrongfully created a non-competition agreement between the parties when, although the confidentiality agreement signed by appellants did not contain a non-compete clause, the chancellor issued an

injunction. We resolved this issue in *Allen v. Johar, Inc.*, 308 Ark. 45, 823 S.W.2d 824 (1992), where Johar alleged its former employee Allen had used confidential information (the design and process of Johar's machines and customer lists) when contacting Johar's customers, and the chancellor enjoined Allen's use of that information because it was protected by the Arkansas Trade Secret Law. This court determined that a non-competition agreement was not a prerequisite for the enjoinment of Allen. As we said in *Johar*, the actual or threatened misappropriation of a trade secret may be enjoined under § 4-75-604; the injunction shall be terminated when the trade secret has ceased to exist or after an additional reasonable period of time in order to eliminate a commercial advantage that otherwise would be derived from the misappropriation. In permitting the issuance of an injunction in these circumstances, the *Johar* decision is also conceptually consistent with this court's acknowledged rule in *Hyde Vending Co. v. Wayne Poultry*, 252 Ark. 355, 479 S.W.2d 250 (1972). There the court stated that, where the case is one in which the negative remedy by injunction will do substantial justice between the parties by compelling the defendant to carry out his contract or lose all benefit of the breach, the remedy at law is inadequate, and there is no reason or policy against it, the court will interfere to restrain conduct which is contrary to the contract, although it may be unable to enforce specific performance of it. *See also Pepsico, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir. 1995) (court upheld the enjoinment of Pepsico's former managerial employee from assuming duties with competitor, based on that employee's knowledge of Pepsico's trade secrets and confidential information).[1]

Appellants' real issue centers on whether Hunt's confidential agreement covered a protected trade secret as that term is defined by Arkansas's Act. Under the Act, trade secret is broadly defined to mean "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper

---

[1] We note the *Johar* and *Pepsico* decisions enjoin former employees from disclosing trade secrets, rather than the employees' new company from performing new business with designated customers of the employees' former company.

means by, other persons who can obtain economic value from its disclosure or use; and (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Ark. Code Ann. § 4-75-601(4) (Repl. 1996).

When the appellant-employees were hired by Hunt, they executed confidentiality agreements that read as follows:

> Employee has . . . been employed by Company to perform certain functions for Company in connection with the development and distribution of Company's services and recognizes and acknowledges the proprietary nature of information received by Employee form [sic] Company about the latter's method of operation, distribution of services and customers.

> It is understood and agreed that all details, instructions, lists, computer programs and other work product developed in connection with Employee's work are at all times the property of Company exclusively. Employee will not copy or reproduce in any way any details, instructions, lists, computer programs or other work product prepared by Employee or prepared by any other employees of Company.

> Employee recognizes . . . that, by reason of Employee's employment with Company, Employee will acquire information concerning company methods, processes, operations, marketing programs, computer programs, future plans and customers, and that such information (hereafter referred to as "Confidential Information") is a valuable asset of Company and affects the effective and successful conduct of Company's business. If known to Company's competitors, such Confidential Information would give such competitors a competitive advantage.

> Employee agrees . . . that during the term of employment, and for a period of one year thereafter, Employee will not discuss, disclose, describe or reproduce in any manner Confidential Information of the Company. It is further understood that a breach of this provision shall entitle Company, in addition to other legal and equitable remedies available to it, to apply to any court of competent jurisdiction to enjoin any violation of this provision.

> * * *

> Appellant-employees and Cardinal submit that Hunt failed to identify any protectable trade secrets. In arguing their point,

appellants contend further that the information possessed by the former Hunt employees was generally known to others in the trucking industry, or readily ascertainable by proper means. They further assert that Hunt did not take reasonable steps to protect its alleged trade secrets. We must disagree.

First, Hunt identified its trade secrets at trial as follows:

(1) The amount of profit that Hunt made on a contract with particular customers.

(2) Hunt's margins of profitability utilized in its pricing model. Hunt submitted that the profitability in the industry is not huge, and if a competitor knows what Hunt's profit margin is regarding a particular customer, that competitor is armed with an unfair advantage. For example, a competitor could knowingly undercut Hunt's price with a particular customer. In addition, a person with special knowledge of what Hunt pays for fuel, equipment, insurance, and other overhead expenses would allow a competitor to anticipate with greater accuracy what price Hunt would charge a customer.

(3) A customer's established buying habits with Hunt over a long-term period.

(4) Hunt's methods of doing business and its processes, operations, marketing programs, computer programs, and future plans. This includes Hunt's proprietary software in logistics and dedicated contract services.

(5) Hunt's strategic planning for the future and how Hunt intends to attack certain markets with specific customers.

If any of the foregoing information falls within the definition of a trade secret, that information may be subject to the protection of the Act, assuming of course, the information derives actual or potential independent economic value, is not properly and generally known or readily ascertainable by others who can obtain economic value from its disclosure, and has been the subject of reasonable efforts to maintain its secrecy.

As is related by the plain terms of the confidential agreement signed by the appellant-employees, they agreed that Hunt's methods, processes, operations, marketing programs, computer programs, future plans, and customers encompass confidential

information that would give Hunt's competitors a competitive advantage. Cardinal, by its president, Derwood Randolph, testified that a company's customer information should be kept confidential, and the profitability of a particular customer should not be disclosed by company employees to competitors.[2]

The type of confidential information and secrets Hunt seeks to protect here are very much like those found in *Pepsico*. There, the Seventh Circuit Court of Appeals affirmed a lower court holding wherein Pepsico, a soft-drink manufacturer, sought to prevent its managerial employee from disclosing trade secrets to competitor Quaker Oats Company, and from assuming any duties of Quaker Oats relating to beverage pricing, marketing, and distribution. In *Pepsico*, the parties never questioned the nature of the trade secrets that Pepsico sought to protect under the Illinois Trade Secrets Act, but we point out the similarity of those trade secrets with the type of confidential information Hunt seeks to protect here. For instance, Pepsico identified its "Strategic Plan," an annually revised document that contains its company's plans to compete, its financial goals, and its strategies for manufacturing, production, marketing, packaging, and distribution for the coming three years. Without this information, Pepsico surmised its competitors could not contemplate Pepsico's next moves. Pepsico also pointed to its annual operating plan as a trade secret, and submitted that such plan included a guide for Pepsico's financial goals, marketing plans, promotional events, growth expectations, and operational changes for that year. The plan contained "pricing architecture," which was highly confidential and would be extremely valuable to a competitor. Knowing Pepsico's pricing architecture would, Pepsico asserted, permit a competitor to underbid Pepsico whenever and wherever the competitor desired. Pepsico offered trade secrets, too, regarding "attack plans" for specific geographical markets and innovations in its selling and delivery systems.

---

[2] While Randolph candidly conceded the confidentiality of such information, he also strangely added, "I really don't think it should be discussed with the competition because really what value is it?"

■ Hunt's chief executive officer, Kirk Thompson, here similarly testified how Hunt's trade secrets derived economic value by keeping confidential information bearing on price modeling, customer profit margins, logistics, future plans, and specific market strategies. Obviously, armed with such information, a competitor would have an edge in capturing some significant part of Hunt's customers and business. In sum, we harbor no doubts that Hunt's confidential agreements signed by appellant-employees cover secrets of the type that are protected by Arkansas's Trade Secret Act.

■ We are also of the opinion that, in the circumstances, Hunt's trade secrets are the type of information that is not generally known or ascertainable by others who might have an interest in such information, and that Hunt took reasonable steps to maintain the secrecy of the information. Hunt's CEO Thompson testified that the company's trade secrets are not readily ascertainable by others outside the company. Thompson said that the confidential agreement Hunt requires employees to sign is one way it assures its trade secrets are not passed to others. It is significant, too, that Hunt's agreement limits its employees from disclosing Hunt's information for a period of one year, which seems patently reasonable for the type of trade secrets covered, especially since the terms of Hunt's customer contracts generally run between one and five years. Thompson also testified that Hunt issues passwords and pass codes to employees who are privy to trade secret information in order to prevent the releasing of such information. Finally, Thompson said that Hunt maintains trade-secret information by the employment of a "loose-lips" policy, which is well known by everyone at Hunt and permits only two Hunt personnel to talk to the media. Cardinal witness Charles W. Clowdis, an independent transportation consultant, countered, indicating his belief that there are no meaningful secrets in the trucking business. He related that a trucking company's costs can generally be ascertained from a variety of legitimate sources and trade journals. However, Clowdis conceded that the profitability of a customer's account is information a company would like to keep confidential and would not want "someone else to know." In other testimony, Clowdis averred such information was "confidential infor-

mation." While there was conflicting testimony offered at trial on these matters, we cannot say the trial court erred by finding Hunt had a protected interest under our Trade Secret Act.[3]

Cardinal next argues that the trial court erred in issuing an injunction because as a threshold matter, Hunt failed to show the threat of irreparable harm. As previously mentioned, a court, under the Arkansas Trade Secrets Act, may enjoin the "actual or threatened misappropriation" of a trade secret, § 4-75-604; *Johar*, 308 Ark. at 47, 823 S.W.2d at 825. *See Pepsico*, 54 F.3d at 1268 (interpreting the Illinois Trade Secrets Act, which allows an injunction against threatened misappropriation). Section 4-75-601(2)(B) of the Act defines misappropriation in relevant part as a "[d]isclosure or use of a trade secret of another without express or implied consent by a person who . . . [a]t the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . [a]cquired under circumstances giving rise to a duty to maintain its secrecy . . . or [d]erived from or through a person who owed a duty to the person seeking relief to maintain its secrecy." A number of federal cases dealing with trade secrets have held that a plaintiff may prove a claim of trade-secret misappropriation by demonstrating that a defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets. *See Pepsico*, 54 F.3d at 1269; *AMP, Inc. v. Fleischhacker*, 823 F.2d 1199 (7th Cir. 1987); *Teradyne, Inc. v. Clear Communications Corp.*, 707 F.Supp. 353 (N.D. Ill. 1989). That is the situation now before us.

Cardinal, of course, disagrees by stating that no wrongful disclosure has been shown, and that Hunt could only speculate that the disclosure of confidential information could take place. Cardinal offered testimony that the appellant-employees had not utilized Hunt's confidential information when contacting Hunt's customers, and in fact, when appellant-employee Timothy F. Voulopos was asked by Home Depot and Office Depot to review the earlier bid he had prepared when he worked for Hunt, Voulopos said that he declined the invitation. Cardinal asserts that, at most, Hunt's

---

[3] In an effort to show how Hunt's information was readily ascertainable, appellants offered evidence that Hunt's pricing model was similar to Ryder's, a competitor, and that Hunt had given its pricing model to a client.

evidence is circumstantial and weak and fails to show the appellants' employment with Cardinal would inevitably lead them to use Hunt's trade secrets. Again, we must disagree.

■ The trial court found appellant-employees now with Cardinal were servicing the same customers that they had serviced when they were employed by Hunt. The trial court further found that (1) Cardinal's president said that he would approve telling customers where Cardinal is better than Hunt, and would approve comparing Hunt's future plans and operational capabilities; and (2) Cardinal or its employees expressed an intention to exploit the holes in Hunt's program (software). Based on the foregoing findings, the trial court found that Cardinal had no compunction about using or disclosing information covered under Hunt's confidential agreement to gain an unfair competitive advantage. We believe such evidence and findings are more than sufficient to show a threatened or inevitable misappropriation of Hunt's trade secrets.

Cardinal and other appellants next contend the clean hands doctrine bars them from obtaining injunctive relief in the circumstances. They complain that Hunt's following improper acts and conduct should bar Hunt from the relief it seeks:

(1) Hunt's unilateral termination of Hostetler's and McLoughlin's bonus plans.

(2) Hunt's harassment of some of the appellant-employees concerning their employment decisions and interference with Hunt's internal communication resources.

(3) Hunt's failure to pay certain amounts due appellant-employees for wages, accrued vacation time, expense reimbursement, and commissions.

(4) Hunt's original bad-faith claim (later withdrawn) that appellant-employees should have obtained Hunt's permission to accept employment with Cardinal.

■ ■ This court has recognized the principal involved in the "clean hands" maxim to be that equity will not intervene on behalf of a plaintiff whose own conduct in connection with the same matter or transaction has been unconscientious or unjust.

*Batesville Truck Line, Inc. v. Martin,* 219 Ark. 603, 243 S.W.2d 729 (1951). However, if the wrong is shown to be merely collateral to the complainant's cause of action, it does not constitute a matter of defense. *Id.* Moreover, the purpose of the maxim is to secure justice and equity, and not to aid one in an effort to acquire property to which he has no right. *Id.* As pointed out above, we affirmed the trial court's holding that protects Hunt's trade secrets and prohibited the appellants' misappropriation of them. As a consequence, we conclude Cardinal is in no position to invoke the clean hands defense. In any event, Cardinal and appellant-employees raise issues that appear only to be collateral in nature to the action brought against them by Hunt. The trial court was correct in holding the appellants' clean hands defense had no merit.

Appellants' final point for reversal is that the trial court erred in failing to require Hunt to post a bond under Ark. R. Civ. P. 65(a)(2) before issuing an injunction, since Cardinal would incur damages from being enjoined from conducting new business with four of its major customers. In *Galloway v. Arkansas State Hwy & Transp. Dep't,* 318 Ark. 303, 885 S.W.2d 17 (1994), the court stated that Rule 65(d) clearly provides a court with discretion to require the giving of an adequate security as a condition precedent to the issuance of a preliminary injunction and that discretion is given the trial court in such matters because that court is in the best position to know whether security should be required. Here, the trial court required no security and, all matters considered, Hunt has not been found wrong to have obtained a preliminary injunction. Therefore, we reject appellants' argument that a bond was required to effectuate the trial court's injunction.

IMBER, J., not participating.