## CITY SLICKERS, INC. *v.* Joseph E. DOUGLAS

CA 00-681                                    40 S.W.3d 805

Court of Appeals of Arkansas
Divisions I and II
Opinion delivered March 7, 2001

*Waring Cox, PLC,* by: *Marcus N. Bozeman;* and *Friday, Eldredge & Clark,* by: *Daniel L. Herrington* and *John C. Fendley, Jr.,* for appellant.

*Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.,* by: *Byron Freeland* and *Marsha Talley Ballard,* for appellee.

S AM BIRD, Judge. Appellant, City Slickers, Inc., is appealing an order of the Pulaski County Chancery Court that denied its motion for a temporary restraining order against appellee, Joseph E. Douglas, by which it sought to enjoin Douglas from violating the Arkansas Theft of Trade Secrets Act. We agree with the chancellor's decision to deny the temporary relief, and we affirm.

The undisputed facts are that City Slickers is a Tennessee Limited Liability Corporation that is registered to do business in Arkansas, and Jeff Goodman is its president. Herein, they are

referred to collectively as "City Slickers." City Slickers is in the business of providing on-site automotive oil-changing services to customers such as rental-car fleets. Douglas was employed by City Slickers from February 1, 2000, to March 17, 2000, as general manager to develop its Arkansas region. Douglas signed three agreements with City Slickers, including a "Non-Disclosure Agreement" dated December 1999, a "Confirmation," and a "Confidentiality and Non-Disclosure Agreement," both dated February 1, 2000. In addition, City Slickers provided Douglas with company documents, including a copy of the corporation's "Executive Summary [and] Business Plan Overview" and a copy of a handbook called the "2000 Little Rock Launch." Douglas resigned from his position with City Slickers on March 17, 2000, and he informed City Slickers that he intended to start his own fleet oil-changing business. Sometime thereafter, Douglas opened his own business.

On March 22, 2000, City Slickers brought an action against Douglas for breach of contract, theft of trade secrets, tortious interference with a contract or business relations, breach of common-law duty not to sue or disclose confidential and proprietary information, unfair competition, and conversion. In its complaint, City Slickers asked the trial court to order Douglas to identify every person or entity whom he solicited to provide services, with whom he had discussed services, and with whom he had entered into contracts; City Slickers also asked the court to issue a temporary restraining order, a preliminary injunction, and a permanent injunction enjoining Douglas and any party assisting him from providing any services to any persons or entities described in the complaint and from directly or indirectly using or disseminating City Slickers' confidential information. City Slickers also asked that Douglas and anyone acting in concert with him be required to return its confidential information and other property, including customer lists, marketing plans, business plans, and pricing plans. Finally, City Slickers asked for punitive damages, prejudgment interest, and attorney's fees.

Also on March 22, 2000, City Slickers filed a motion for a temporary restraining order and preliminary injunction, and attached a supporting brief. Douglas filed a response to the motion for a temporary restraining order on March 31, 2000, arguing that the information was not confidential, that City Slickers has not demonstrated a continuing interest in opening a business in Arkansas, and that City Slickers breached its agreement with Douglas. A hearing on the motion for a temporary restraining order was held on March 31, 2000, and Douglas moved for a directed verdict.

On May 9, 2000, the chancellor issued an order holding that City Slickers had failed to demonstrate the likelihood of success on the merits of its claim that the financial and business information it provided to Douglas constituted a trade secret or was "highly-proprietary" information. The court further found that the February 1, 2000, confidentiality and nondisclosure agreement constituted an unreasonable and unlawful restraint on trade and that it was an overly broad covenant not to compete masquerading as a confidentiality and nondisclosure agreement. The chancellor denied City Slickers' motion for a temporary restraining order.

The two issues that City Slickers raises on appeal are (1) whether the chancery court erred by concluding that there was no substantial likelihood that it would prove that the materials provided to Douglas were confidential and constituted "trade secrets" for purposes of the Arkansas Theft of Trade Secrets Act, and (2) whether the chancery court erred when it concluded that various confidentiality agreements signed by Douglas were unenforceable. City Slickers also asks that this court enter an injunction.

■ The grant or denial of an injunction is generally a matter within the discretion of the chancery court, and we do not reverse the court unless there has been a clearly erroneous factual determination, or unless the decision is contrary to a rule of equity or the result of an improvident exercise of judicial power. *Dawson v. Temps Plus, Inc.*, 337 Ark. 247, 987 S.W.2d 722 (1999).

The first issue we address is whether the chancery court erred by concluding that there was no substantial likelihood that City Slickers would prove that the materials provided to Douglas were confidential and constituted "trade secrets" for purposes of the Arkansas Theft of Trade Secrets Act. The Arkansas Theft of Trade Secrets Act is codified at Ark. Code Ann. §§ 4-75-601 through 4-75-607. The portions relevant to this appeal provide:

> (4) "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> > (A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ark. Code Ann. § 4-75-601 (Repl. 1996). The Act also provides for both injunctive relief and damages for trade secret violations.

■ The six factors used in determining what constitutes a trade secret are: (1) the extent to which the information is known outside the business; (2) the extent to which the information is known by employees and others involved in the business; (3) the extent of measures taken by appellee to guard the secrecy of the information; (4) the value of the information to appellee and to its competitors; (5) the amount of effort or money expended by appellee in developing the information; and, (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Saforo & Assocs., Inc. v. Porocel Corp.*, 337 Ark. 553, 991 S.W.2d 117 (1999).

In the instant case, City Slickers alleges that Douglas misappropriated trade secrets found as information in its "Little Rock Launch 2000" handbook and its executive summary and business plan overview. In support of this assertion, it points to Jeff Goodman's testimony about documents that were provided to Douglas.

Goodman testified that general managers were given the company's executive summary, business plan overview, and financial performance, present, past and projected, before coming to work for the company, and that they were required to sign a nondisclosure and confidentiality agreement before receiving the documents. He said that every employee was given the employee handbook, which contained a paragraph concerning the confidentiality of company secrets; that every employee had to sign an agreement to abide by the handbook; and that, additionally, employees at the general manager level also sign nondisclosure and confidentiality agreements. Goodman also said that Douglas signed a nondisclosure agreement when he received the marketing plan and signed the confirmation agreeing to abide by the employee handbook, including the confidentiality clause.

Goodman further testified that Douglas began working for the business on February 1, 2000, with full autonomy in running the company's Arkansas business. Goodman said that Douglas was able to quote prices for automobiles in the range of $19.99 to $29.99 for a standard, five-quart, 10W30 oil change; that Douglas was instructed on how to identify and contact customers; and that they

discussed ways the business had found customers in Memphis. Goodman explained that the business had a book of lists it had purchased that identified the largest companies in the city, and that people were contacted from those companies. Goodman stated that marketplace software was also used to find customers, and that, apart from that, Douglas was provided a list of current customers that had been developed, such as Enterprise and Service Master, who had Little Rock offices and who would be Douglas's initial core customers.

Goodman testified as follows regarding financial and marketing information in the business plan:

> With regard to financial information, it included our income statements since 1998 and our projected future income statements. It also has our balance sheets, our cash flow and the supporting financials broken down city by city. It contains our profit margin and debt ratios in the past and projected for the future. That information in the hands of a competitor would allow them to come in and undermine our pricing structure. We don't want our competitors to have that information. It loses its value if it's distributed to the general public. In regard to marketing information, it discusses our print advertising, our radio advertising, television advertising, how much we're willing to spend, and how we plan on marketing this to our customers in cities where we open up, and how we will try to thwart any competition that tries to come in. It also identifies the cities in which we plan to expand. It contains business plans on how we're going to penetrate those markets.... It's taken us two years to put this business plan together. We've hired outside experts to assist us, two accounting firms in Memphis and a marketing firm. We have ten to twelve thousand dollars ($10,000–$12,000) invested in this business plan. It contains information that's not readily available to someone who's just starting up this business from scratch.

Goodman testified that other confidential information was provided to Douglas in the form of the Little Rock Launch 2000 handbook, which he said was the marketing plan developed specifically for Little Rock. He further described the handbook:

> It gives a brief industry and company overview, describes our core service and identifies our target audience. It also identifies our competitors. It is all specific to the Little Rock market. The information on pages 6A and 6B is an advertising schedule for Little Rock that would cover TV, radio and print media. That's very

valuable to us. We would not want it in the hands of a competitor. It would allow them to anticipate what we're going to do. It also tells them what we're willing to spend in the market. It would lose its value if distributed to our competitors. We tried to ensure the secrecy of these plans with the non-disclosure and confidentiality agreements.... We also have control numbers on each copy so we know who has a copy....

Goodman then responded to questions about how Douglas intended to get customers. Goodman admitted that he had not heard "any radio or newspaper ads," nor had he seen that Douglas used any of the business's advertising materials. Goodman said that he was aware that there were all kinds of things on the Internet that have prices of products and profit margins for the industry. He further testified:

I assume that Mr. Douglas is using my customer list. He would certainly have access to that. He definitely has to be using my pricing schedules. There's nothing tangible that I can tell you that he's using other than the knowledge that he's gained.... A person with reasonable intelligence could look in the phone book and locate all the rental car companies.... With regard to Mr. Douglas' use of our pricing schedules, I know from the comments he made while he was employed by us that he disagreed with some of our pricing schedules and wanted to change some of the pricing on some of the vehicles. I am assuming he's doing what he wants to do now.... Our oil extraction system is atypical of the common quick lube industry.... [The] product is available on the open market.... One of our trade secrets is our advertising program. I don't have any information that Mr. Douglas has used our advertising program over the last two weeks.... We have not run a single ad in the Little Rock metropolitan area.

■ In support of its argument that Douglas misappropriated trade secrets, appellant cites *Cardinal Freight Carriers, Inc. v. J.B. Hunt Transp. Servs., Inc.*, 336 Ark. 143, 987 S.W.2d 642 (1999), as a case identical to the instant case. However, *Cardinal* involved former employees of Hunt Transportation who had worked for Hunt for six years; in the instant case, Douglas worked for City Slickers only six weeks. There was testimony in *Cardinal* that Hunt's trade secrets included the amount of profit that Hunt made on a contract with particular customers, Hunt's margins of profitability utilized in its pricing model, a customer's established buying habits with Hunt over a long-term period, Hunt's methods of doing business, and Hunt's strategic plans for the future and how to attack certain

markets with specific customers. *Id.* In the case at bar, the chancellor correctly held that it was unlikely that City Slickers could prove that they have trade secrets that need protection under the Act. Information in the subject documents can be ascertained without utilizing City Slickers' documents. City Slickers has only one actual customer in Little Rock; the business plan uses statistics from public surveys and studies; its customer profile and competition figures are easily ascertainable from phone books and surveys; its marketing campaign in the business plan does not include the Little Rock market; and the master customer list includes only Memphis businesses.

■ ■ City Slickers failed to point out any instances in which Douglas is utilizing its plans, and it admitted that Douglas did not agree with its pricing structure and is probably using his own prices. City Slickers also admitted that a person of reasonable intelligence could determine which businesses might have automotive fleets that need servicing; that City Slickers has not run a single ad in the Little Rock metropolitan area; and that it has no information that Douglas has used this information. Additionally, the advertising information itself is composed of demographics of the best time slots, and that information is readily available and easily accessible through various media outlets. Based on these facts, we cannot say that the chancellor was clearly erroneous in denying the motion for temporary injunction.

The chancery court did not address the issue of whether Douglas misappropriated trade secrets because it found it unlikely that City Slickers could prove that the documents were trade secrets within the meaning of the Act. We agree with the chancellor and do not reach this issue.

The final issue is whether the chancery court erred when it concluded that various confidentiality agreements signed by Douglas are unenforceable. The three agreements that Douglas signed with City Slickers are the December 1999 nondisclosure agreement, and the February 2000 confirmation, and confidentiality and nondisclosure agreement. The pertinent portion of the nondisclosure agreement provides:

> Definition of Confidential Information. Confidential Information as used throughout this Agreement means any secret or proprietary information relating directly to Goodman's business and that of Goodman's affiliated companies and subsidiaries, including but not limited to, products, customer list, pricing policies, employment,

otherwise records and policies, operational methods, marketing plans and strategies, product development techniques or plans, business acquisition plans, new personnel acquisition plans, methods of manufacture, technical processes, designs and design projects, inventions and research programs, trade "Know-how", trade retaining secrets, specific software, algorithms, computer processing systems, object and source codes, user manuals, systems documentation and other business affairs of Goodman and Goodman's Affiliated companies and subsidiaries.

The confidentiality and nondisclosure agreement states:

I, Joseph E. Douglas ... agree and understand and acknowledge that all information I see, hear, come in contact with or otherwise gain knowledge of, in connection with my employment with City Slickers, Inc.... is CONFIDENTIAL AND PROPRIETARY INFORMATION. I agree that I will not discuss, reveal or permit the duplication, use or disclosure of ANY information, to which I have access, to any person or entity, unless I am specifically authorized....

I AGREE THAT THIS AGREEMENT ON MY PART SHALL CONTINUE FOR A PERIOD OF FIVE (5) YEARS BEYOND MY EMPLOYMENT WITH THE COMPANY.

Specifically, the chancellor found that the confidentiality and nondisclosure agreement constituted an unreasonable and unlawful restraint of trade, and that it was an overly broad covenant not to compete masquerading as a confidentiality and nondisclosure agreement.

The Arkansas Supreme Court has long held:

It would abridge competition in business, the life of trade, if an employee who had rendered services to a business of any character for a long period of time and who had helped build up a business on account of performing his duties well should be prohibited after severing his relationship with a business concern from establishing and prosecuting a similar business in the same territory or field in which his employer had done business, especially where the employee had not contracted when entering into the employment to refrain from establishing an independent business of like nature. Legitimate competition should be encouraged rather than restricted, and, in the aid of the freedom of employment, combinations and monopolies which would result in the restraint of trade

should not be tolerated in a democratic form of government. Certain restrictions have been imposed upon employees when severing their relationship with an employer. For example where the particular business in which he had been employed has trade secrets an employee is not permitted to set up an independent business of a similar nature and use the trade secrets of his employer or confidential information received from his employer in the new or independent business in which he engages, *but it is allowable for him to use his experience and knowledge gained during the period of his employment in his independent business.* The experience and knowledge ·he had acquired as an employee in no sense becomes the property of his employer.

*Witmer v. Arkansas Dailies, Inc.*, 202 Ark. 470, 476, 151 S.W.2d 971, 974 (1941) (emphasis added).

█ Jeff Goodman testified that the nondisclosure agreements would prevent Douglas from working in the oil-changing business for five years. In light of the holding in *Witmer*, we agree that the nondisclosure agreements here constitute unreasonable and unlawful restraints of trade and are overly broad, and that the agreements that were signed by Douglas clearly violate the supreme court's holding in *Witmer*.

Affirmed.

HART, JENNINGS, and NEAL, JJ., agree.

PITTMAN and GRIFFEN, JJ., dissent.

WENDELL L. GRIFFEN, Judge, dissenting. I agree with the majority that the chancellor did not err in determining that City Slickers' customer list did not constitute a trade secret and that the February 1, 2000 confidentiality agreement is a covenant not to compete masquerading as a confidentiality and nondisclosure agreement. However, I dissent because I believe the chancellor erred in finding that there was no substantial likelihood that appellant could establish that the detailed information specific to City Slickers contained in the Little Rock Launch 2000 marketing plan and in the business plan were not trade secrets, and in finding that City Slickers had no legitimate business interest in customers in the Little Rock service area.

The Little Rock Launch handbook in this case provided a detailed plan for penetrating the Little Rock market, including a

schedule of when and through what venues, at what time, and for what duration, appellant would advertise through television, radio, and print media, and the cost of such advertising. The handbook further describes distinct "tactics" for its public relations campaign, identifying on which specific dates and times and to which specific radio, television, and newspaper personalities it will offer on-site oil changes to promote its business. Finally, it described the contents of its press kits, a public relations time line, and its budget for the Little Rock launch. Appellant Goodman testified that the Little Rock launch information was very valuable to City Slickers because it allows a competitor to anticipate what the company was going to do, and informs competitors what the company is willing to spend in the market. He also testified that there were only four copies of the Little Rock launch handbook and that appellee never returned his copy.

The separate business plan in this case was prepared to explain the company's operations to potential investors, and contained a confidentiality and nondisclosure agreement. This plan generally explained the company's operation, listed some of its more prominent customers, and declared City Slickers' intent *within the next twelve months* to expand into four additional markets, including Little Rock. The plan provided an industry overview, a financial summary and company overview of City Slickers, which includes its staff, a general customer profile, identifies its competition, and its general approach for its long-range marketing campaign, including a list of fifty-one metropolitan markets it intends to penetrate. The plan also included a customer reference list, a clipping from the *Memphis Business Journal* highlighting the company, and a magazine article from the *National Oil & Lube News* containing results of the 1999 Mobile Lube Survey. This survey contains such information on 110 mobile lube operations, as the average costs of operation. City Slickers did not participate in this survey.

The business plan also contained statements of explanations and assumptions, pricing information, and a statement of the "corporate financials." The explanations and assumptions section includes information such as the price per oil change, overhead costs, operating expenses, corporate expenses, and a balance sheet indicating accounts receivable, and costs to service equipment and vehicles. The pricing information lists the service provided, the type of vehicle, the type of oil to be used, the price for different types of vehicles and the price of extra oil.

The statement of corporate financials contains actual information for 1998-99, and projected information for 2000-02, concerning the company's revenues, costs of sales including gross profit margin, operating expenses, inventory, accounts payable, and net loss. This information was provided on a monthly basis. Appellee also had access to the company's corporate income statement, supporting financials for new markets, projected cash flow, balance sheets, and vehicle service information.

Our supreme court has held that information such as price modeling, customer profit margins, logistics, future plans, and specific marketing strategies are protected under the Trade Secrets Act. *See Cardinal Freight Carriers, Inc. v. J.B. Hunt Transp. Serv.*, 336 Ark. 143, 987 S.W.2d 642 (1999). Moreover, an examination of the above information and an application of the *Safaro* factors, as noted by the majority, weigh in favor of finding that the above information likely constituted trade secrets.

First, Goodman testified that it took the company two years to compile its business plan, at an expense of $10,000 to $12,000. Second, City Slickers took numerous reasonable measures to insure the secrecy of its information. The company placed control numbers on the plans and on the back of the nondisclosure agreements. Further, the company defined confidential information to include precisely the type of information it supplied to appellee; it had appellee sign three separate nondisclosure statements; it took measures to limit the unauthorized use, copying or removal of confidential information by not only its employees, but also its potential investors and their employees; it used control numbers and limited the number of copies available. Finally, it disclosed confidential information to those only at the general manager position or higher.

Closely related to the steps taken to insure secrecy of the information is the question of whether the information contained in the handbook and business plan was readily ascertainable and/or could be properly acquired or duplicated by others. Appellee argues that the information contained in the handbook and business plan is not protected under the Trade Secrets Act because he did not need the information in the handbook and business plan to start an on-site oil changing operation. However, the test for determining whether information constitutes a trade secret is not a "but-for" test. That is, the issue is not whether appellee could have started his business but for the information appellants provided him. The issue is whether appellee's new employment will inevitably lead him to

rely on the plaintiff's trade secrets. *See Cardinal Freight*, 336 Ark. at 152, 987 S.W.2d at 646. *See also Bendinger v. Marshalltown Trowell Co.*, 338 Ark. 410, 994 S.W.2d 468 (1999).

The majority failed to address this issue, but the inevitable disclosure inquiry is a factual inquiry that may include consideration of the similarity of the employee's new job to the position he held with his former employer and consideration of whether or not he exhibited a lack of compunction about using his former employer's proprietary information to gain an unfair tactical advantage. *See Bendinger*, 338 Ark. at 421-23, 994 S.W.2d at 474-75; *Cardinal Freight*, 336 Ark. at 152-53, 987 S.W.2d at 646-47. The inevitable disclosure principle seems squarely applicable here, as it is difficult to conceive of how appellee, with no prior experience in the automotive oil changing industry, could *operate an on-site oil changing facility after a mere six weeks of training without misappropriating the information provided by City Slickers.*

The majority maintains that the information in the subject documents can be ascertained without utilizing City Slickers' documents because the business plan uses statistics from public surveys and studies; because its customer profiles and competition figures are easily ascertainable from phone books and surveys; and because its marketing campaign in the business plan does not include the Little Rock market. However, the detailed information relating specifically to City Slickers and the Little Rock marketing plan contained in the business plan and handbook is not easily ascertainable. Further, although information regarding the existence and operation of an on-site oil changing business may be found on the Internet and in trade publications, the detailed information regarding City Slickers' methods of operation, in particular, is not. Moreover, the examples of information available on related Internet pages offered by appellee in his brief do not provide the level of detail found in appellants' business plan and Little Rock launch handbook. Even appellants' own Internet page, by which it provides on-line quotes, is not published. Finally, although anyone can call a radio or television station or newspaper and receive an estimate on how much air time will cost, the advertising plan, formulated at considerable expense to City Slickers, has obviously been designed to reach the company's target audience.

Further, appellee's position with appellant is virtually identical to his current position. Goodman testified that appellee's job was to "start up" and manage the business in the Little Rock area, which is

precisely what appellee is now attempting to do on his own. Appellee demonstrated no compunction about using the confidential information to create an unfair advantage for himself. The same day that appellee resigned, he used his knowledge of City Slickers' pricing structure, contacted one of City Slickers' potential customers, and offered to match any quote the customer had already been given. Goodman testified that when appellee resigned, appellee told him that he intended to open his own oil-changing operation and compete with Goodman in the Little Rock market. Finally, appellee either informed or misinformed a Little Rock customer that City Slickers' entry into the Little Rock area would be delayed.

The majority attempts to distinguish *Cardinal Freight* because it involved specific customers, whereas appellee and City Slickers are essentially competing for new customers. The majority also maintains that Douglas has not actually misappropriated any information. It is true that some of the information in *Cardinal Freight* related to specific customers, such as the profit margin and marketing plans for specific customers, but that case also involved general information regarding the employer's method of doing business and its marketing program. Moreover, it is the nature of the *information* that is dispositive, not the nature or duration of the customer/employer relationship. It is also true that there is no proof in the record that appellee has misappropriated any confidential information. However, a court may enjoin the threat of misappropriation under the Trade Secrets Act. *See* Ark. Code Ann. § 4-75-604; *Cardinal Freight, supra.* Based on the above authorities, I would hold the chancellor erred in determining that there was no substantial likelihood that appellant would be able to show that the information contained in the Little Rock Launch 2000 and in the business plan constituted trade secrets.

I also believe the chancellor erred in finding that appellant did not have a legitimate business interest in customers in the Little Rock area. A legitimate business interest arises when an employer provides special training or makes available trade secrets, confidential business information or customer lists, if the associate can use that information to gain an unfair advantage. *See Duffner v. Alberty,* 19 Ark. App. 137, 139-40, 718 S.W.2d 111, 112 (1986). As noted above, City Slickers expended considerable time and resources to develop plans to enter the Little Rock market, including the cost of hiring, training, and supporting Douglas as he began developing that market. Specifically, the evidence showed that a competitor's knowledge of City Slickers' overhead costs could be critical information in placing a bid to a potential customer, because such

knowledge would allow a competitor to have a good estimate of how much City Slickers could bid per vehicle, which would allow a competitor to match or beat City Slickers' bid.

In sum, it appears that appellee approached Goodman seeking employment and stayed with the company long enough to determine that Little Rock was a seemingly untapped market for an on-site oil changing business. Armed with the knowledge gleaned from two years' worth of research explaining how to advertise and start such a business in that specific, untapped market, and how to build a customer base, appellee obtained a private investor and attempted to open his own business. While appellee did not need such information to start such a business, there is ample proof in the record suggesting that he would be able to use the information to an unfair advantage.

Appellee maintains that he only intended to match City Slickers' price, not to undercut it. It is precisely this pivotal issue that appellee and the majority misapprehend in this case: the same factors that enabled appellee to match appellants' price support a finding that he violated the Trade Secrets Act. That is, Douglas was able to match City Slickers' price only because that information was made available to him as an employee of City Slickers, and only after he signed a confidentiality agreement. Unfortunately, the majority opinion sanctions that conduct as permissible under the Arkansas Trade Secrets Act.

For the above-noted reasons, I respectfully dissent. Judge PITT-MAN has authorized me to state that he joins this opinion.