Eugene E. BILO, Jr.  *v.*
EL DORADO BROADCASTING CO.

CA 07-507                                             275 S.W.3d 660

Court of Appeals of Arkansas
Opinion delivered February 13, 2008

[Rehearing denied March 19, 2008.*]

* GLADWIN and GRIFFIN, JJ., would grant rehearing.

*Compton, Prewett, Thomas & Hickey, LLP*, by: *Floyd M. Thomas, Jr.*, for appellant.

*Vickery & Carroll, P.A.*, by: *Ian W. Vickery*, for appellee.

JOSEPHINE LINKER HART, Judge. Eugene Bilo appeals the trial court's finding that he diverted a natural watercourse from his property onto the land of El Dorado Broadcasting Company (EDB). Bilo argues that he diverted surface water, which the common-enemy doctrine allowed him to do without incurring liability. He also argues that the trial court did not provide objective criteria to enforce the judgment. We affirm.

Bilo's property is a rectangular tract located at the corner of Timberlane Drive on the east and Hillsborough Road on the south in El Dorado. EDB owns the land to Bilo's west. The area is primarily commercial with some residential use to the north. The topography is such that the land slopes downward from the north and west toward the parties' tracts and the intersection. Water has historically flowed from these upland areas onto Bilo's tract,

continuing south through a culvert under Hillsborough Road, then back to the east through culverts under Timberlane Drive. Before Timberlane was constructed, the water ran through a broad valley south of Hillsborough. According to EDB's owner, Ross Partridge, Bilo placed land fill on his (Bilo's) tract and diverted this water onto EDB's land, endangering EDB's broadcast tower and guy anchor. EDB sued Bilo on May 10, 2005, to restore the natural water flow.

The evidence at trial showed that, when Bilo began developing his property in 2004 or 2005, he placed land fill on virtually his entire tract, including along his border with EDB. Photographs show that the fill was made up of large mounds of dirt and shards of concrete and that it elevated Bilo's tract considerably higher than EDB's. Before the fill was placed, Bilo's tract was a swampy lowland, containing willow trees, mud, and beaver dams. Ross Partridge testified that, prior to Bilo's fill activities, small rainfalls did not cause water to flow onto EDB's land, and only twenty to twenty-five percent of water from heavy rainfalls did so. But, he said, after Bilo's placement of the land fill, one hundred percent of the upland water flowed onto EDB's property. Partridge feared that the increased water flow would weaken the foundation of EDB's tower. He told the court that he was not asking Bilo to remove the land fill but to put in a ditch or culverts. He referred, as an example, to a large ditch constructed by First Financial Bank, located south across Hillsborough. This ditch controlled the flow of water as it made its way southward.

Robert Edmonds, the city of El Dorado's public works director, testified that this locale was a significant drainage area with enough flow to entice beavers to "do their work" building dams. He testified that the city removed beaver dams from the Bilo tract in approximately 2003 because "through that creek bottom there is a flood plain" and "when the creek is obstructed . . . the base flood [level] then rises." The water flow was restored after the dams were eradicated. But, Edmonds said, about a year later, Bilo "started hauling fill in there and filling up the whole bottom." Edmonds received several calls asking "why this marsh land was being filled in." He contacted Bilo and told him the property should be "culverted." Bilo thought the city should take care of the culverts, and he continued to fill the land. Edmonds said that water did not percolate through the fill. Rather, the fill operated like a dam or levee, and water now flowed between the Bilo tract and the EDB tract at an elevation lower than the fill. The drainage situation was worse, he stated, than when the beaver dams were

there, but culverts or ditches could be used on Bilo's land to address the problem. Edmonds said, "you just can't put fill in the water way."[1]

Bilo testified that the area in question was in a flood plain, was a significant drainage area, and was, at least in part, a "wetland." He sought a permit from the Corps of Engineers to do the fill work after the Corps informed him that it was investigating "a discharge of fill material into a wetland associated with an unnamed tributary of Bayou de Loutre." Bilo's application listed the Bayou de Loutre as the body of water connected with the project. Thereafter, the Corps issued the permit authorizing Bilo to discharge fill material "into waters of the United States associated with the construction of a commercial development." The permit expressly stated that it did not authorize work that could adversely affect adjacent property. Bilo testified that he was merely filling in his property as a former owner had done to prevent erosion, though he said that he did "elevate" the fill by a few additional feet. He also said that he intended for the fill to slope toward Timberlane on the east so that the water would flow onto the curb of the street. He denied any damage to EDB's land. Yet, he agreed that he was in no position to dispute Partridge's testimony that more water now flowed onto EDB's property.

The court found that the drainage across Bilo's land was part of a natural watercourse and that Bilo's diversion of water onto EDB's property was unreasonable. Bilo was enjoined "from further fill activities" on the west side of his property and was ordered to construct, at his own expense, "drainage facilities to prevent no more than 20% of the flow of water" onto EDB's land. If Bilo chose to construct the drainage ditch on the west side of his tract, EDB was to contribute twenty percent of the land required. Bilo appeals from that ruling.

This is a case in equity involving the issuance of an injunction, and our review is therefore de novo. *See generally Ark. Game & Fish Comm'n v. Sledge*, 344 Ark. 505, 42 S.W.3d 427 (2001); *Clark v. Casebier*, 92 Ark. App. 472, 215 S.W.3d 684 (2005). We review the trial court's decision to award injunctive relief for an abuse of discretion, *see United Food & Comm. Workers Int'l Union v.*

---

[1] Bilo argues for the first time in his reply brief that the trial court erred in allowing Edmonds to testify as an expert. We do not address arguments raised for the first time in a reply brief. *See Abdin v. Abdin*, 94 Ark. App. 12, 223 S.W.3d 60 (2006).

*Wal-Mart Stores, Inc.*, 353 Ark. 902, 120 S.W.3d 89 (2003), and we review the court's factual findings leading to the issuance of the injunction under the clearly-erroneous standard. *See So. College of Naturopathy v. State*, 360 Ark. 543, 203 S.W.3d 111 (2005); *City Slickers v. Douglas*, 73 Ark. App. 64, 40 S.W.3d 805 (2001). A finding is clearly erroneous when, although there is evidence to support it, the appellate court, upon viewing the entire evidence, is left with the definite and firm conviction that a mistake has been committed. *See Ligon v. Stewart*, 369 Ark. 380, 255 S.W.3d 435 (2007).

Bilo argues that the trial court erred in finding that he diverted a natural watercourse and, consequently, that the court erred in judging his conduct under a reasonableness standard. He contends that the court should have found that he diverted mere surface water, which would entitle him to the benefit of the standard set forth by the common-enemy doctrine, to wit:

> Where no watercourse exists . . . a landowner is justified in defending against surface runoff without incurring liability for damages unless injury is unnecessarily inflicted upon another which, by reasonable effort and expense, could be avoided.

*See Boyd v. Greene County*, 7 Ark. App. 110, 112, 644 S.W.2d 615, 616-17 (1983). Bilo also argues that, under our supreme court's holding in *Levy v. Nash*, 87 Ark. 41, 112 S.W. 173 (1908), his status as an urban landowner gave him even more freedom to fend off surface water without incurring liability.

Our law defines a watercourse as:

> [A] running stream of water; a natural stream, including rivers, creeks, runs and rivulets. There must be a stream, usually flowing in a particular direction, though it need not flow continuously. It may sometimes be dry. It must flow in a definite channel, having a bed and banks, and usually discharges itself into some other stream or body of water. It must be something more than mere surface drainage over the entire face of the tract of land occasioned by unusual freshets or other extraordinary causes.

*Boyd*, 7 Ark. App. at 112, 644 S.W.2d at 617 (1983) (quoting *Boone v. Wilson*, 125 Ark. 364, 188 S.W. 1160 (1916)). We see no clear error in the trial court's finding that the water diverted by Bilo was a watercourse. Accordingly, we need not address his arguments concerning diversion of surface water.

■ The evidence showed that the water moved through Bilo's tract with such flow and direction that beavers built dams, thus indicating a flow through a definite channel. The large drainage ditch constructed by First Financial Bank, the parties' neighbor to the south, is further indication of the water's force, volume, and constant flow along this path. Additionally, the water was referred to by public works director Robert Edmonds as a "creek" and a "water way." Corps of Engineers documents stated that Bilo had discharged fill material into a "wetland associated with an unnamed tributary of Bayou de Loutre," and Bilo's application listed the Bayou de Loutre as the body of water connected with the project. And, the court found that the water ultimately drained south and east "into Loutre Creek." These factors demonstrate that more than mere surface water flowed across Bilo's tract.

■ We therefore have no definite and firm conviction that the trial court was mistaken when it characterized the diverted water as a watercourse.[2] We are not dissuaded by the trial court's lack of findings regarding the presence of well-defined bed and banks. Their absence may be explained by the fact that the water had been diverted away from this course at least once in the past and that the water had begun to coalesce along this course once again after Timberlane Drive was constructed. We also distinguish *Boyd, supra*, on which Bilo relies. There, the evidence was "virtually undisputed" that the water in question was "mere surface drainage." *Boyd*, 7 Ark. App. at 113, 644 S.W.2d at 617. That matter is in great dispute here.

■ Bilo argues next that the trial court should have provided a legal description of that part of his land that he was enjoined from filling. A trial court's order must provide a legal description when locating boundary lines or easements. *See Johnson v. Jones*, 64 Ark. App. 20, 977 S.W.2d 903 (1998); *Jennings v. Burford*, 60 Ark. App. 27, 958 S.W.2d 12 (1997). Bilo cites no persuasive authority that these holdings should be applied in a case that does not involve a dispute over property lines or ownership.

Affirmed.

PITTMAN, C.J., ROBBINS, and BIRD, JJ., agree.

---

[2] Bilo does not challenge the trial court's finding that his conduct was unreasonable.

GLADWIN and GRIFFEN, JJ., dissent.

ROBERT J. GLADWIN, Judge, dissenting. I believe that the trial court was clearly erroneous in finding that the drainage across appellant's land was a natural watercourse, and therefore I would reverse. A natural watercourse is defined as:

> [A] running stream of water; a natural stream, including rivers, creeks, runs and rivulets. There must be a stream, usually flowing in a particular direction, though it need not flow continuously. It may sometimes be dry. It must flow in a definite channel, having a bed and banks, and usually discharges itself into some other stream or body of water. It must be something more than mere drainage over the entire face of the tract of land occasioned by unusual freshets or other extra ordinary causes.

*Boyd v. Greene County*, 7 Ark. App. 110, 644 S.W.2d 615 (1983) (quoting *Boone v. Wilson*, 25 Ark. 364, 188 S.W. 1160 (1916)).

The trial court listed the following reasons for finding the drainage a natural watercourse:

> a. The watershed which produces the drainage is large in area. The exact dimensions are not in evidence, but the area includes a number of streets and houses to the north and northwest, businesses to the west along the north side of Highway 82B and undeveloped land to the north owned by Bilo's company.
>
> b. Beavers used to inhabit the area.
>
> c. The property of E.D. Broadcasting constitutes minuscule amount of the watershed area. Likewise only a minuscule amount of the water draining across Bilo's land came from the land of E.D. Broadcasting. Conversely, the vast majority of the water comes from the property of other owners, including Bilo's company.
>
> d. Bilo's land has long been a drainage area while E.D. Broadcasting's land has been used for radio stations for about thirty years.
>
> e. The land of Bilo was identified as wetlands by the U.S. Corp. of Engineers and a permit for the fill was required.

None of these factors fit the definition of a watercourse and in fact confirm that this is surface water. The court describes no definite channel with bed and banks. In fact it seems to state that

water runs from the homes and business to the north and north-west, from the business to the west and from the contiguous land to the north. Apparently this watercourse runs both to the south and the east and contains streets and houses, but no actual banks or bed.

The fact that beavers once inhabited the area is of no import. There is no evidence in this record that beavers will only inhabit a natural watercourse as defined by Arkansas case law.

That E.D. Broadcasting constitutes a minuscule amount of the watershed only reinforces that the water is flowing from several directions and is not a part of a defined channel. Further, that appellant's land has long been a drainage area proves that this may be a collection area for surface water but not a natural watercourse that must usually discharge itself into some other stream or body of water, as required by our definition of a natural watercourse. Finally, the Army Corps. of Engineers map that was introduced along with its letter of June 13, 2005, does not show any unnamed tributary of Bayou de Loutre, and does not show where the parties' properties are located.

This land is a developed urban area in El Dorado, with a car lot, residential area, and other businesses located at or near this intersection. The pictures that were introduced clearly show that if there had ever been a "tributary" or "creek," it has been obliter-ated by the development of the area. This is now an urban intersection with roads and man-made culverts. I simply believe the trial court's finding that this drainage is a natural watercourse is not supported by the evidence and is clearly erroneous.

Because I would find the drainage to be surface water, I believe that *Levy v. Nash*, 87 Ark. 41, 112 S.W. 173 (1908), controls. In *Levy* the Arkansas Supreme Court stated:

> The lot of the defendant is in the midst of a populous city. The rule which governs the right to dispose of surface water in agricultural districts does not apply to such property. It is set apart, held and owned for building purposes. To make it useful for this purpose the owner has the right to fill it up, elevate it, to ditch it, to construct building on it in such a manner as to protect it against the surface water of an adjoining lot. If in so doing he presents the flow of surface water upon his lot, the owner of the higher lot has no cause of action against him. This is necessary incident to the ownership of

such property. A contrary rule would operate against the advancement and progress of cities and towns and to their injury, and would be against public policy.

87 Ark. at 44, 112 S.W. at 174.

Under the rule set out in *Levy*, "The owner has the right to fill it up, elevate it, to ditch it, to construct buildings on it in such a manner as to protect it against the surface water of an adjoining lot." 87 Ark. at 44, 112 S.W. at 174. Here the appellant filled it up as provided in *Levy*. Therefore appellant could divert the water as he did.

As I believe that a natural watercourse as defined by our cases does not flow through this paved intersection in El Dorado, I would reverse.

GRIFFEN, J., joins.