## Wael ABDIN *v.* Delores ABDIN

CA 05-169                                                    223 S.W.3d 60

### Court of Appeals of Arkansas
### Opinion delivered January 18, 2006

*Hatfield & Lassiter*, by: *Richard F. Hatfield*, for appellant.

*Bond & Chamberlin*, by: *Will Bond* and *Neil Chamberlin*, for appellee.

DAVID M. GLOVER, Judge. Appellant Wael Abdin appeals from the denial of his petition to probate a lost will. We affirm.

Muhammad Abdeen, later known as Mike Abdin, immigrated to the United States from Israel in 1960. He married

Delores Robertson in 1961, and they had two daughters. He found financial success as the owner of a jewelry store in Jacksonville, Arkansas, and through real-estate investments. Two of Mike's brothers, Wael and Ziad, also moved to the United States in the late 1960s or early 1970s.[1] Mike's mother and several other brothers and sisters remained in Israel. Mike regularly provided financial assistance to his Israeli relatives, in particular his sisters and his late mother.

Beginning in the 1970s, Mike traveled to Israel every year or two. On some occasions, he left blank checks for his family members to use as needed. His last trip occurred in January 2000, shortly before his death. At that point, he was suffering from heart disease and diabetes, which affected his eyesight and his ability to walk. Nevertheless, he made the trip and stayed for approximately one month. While there, he was a guest at the home of his brother Hatem. Hatem and another brother, Hani, would later testify that Mike executed a will during this trip. They stated that, upon Mike's request, they accompanied him into Jerusalem to see a "court clerk" named Khaled Alkam. Alkam worked in a street-side booth "prepar[ing] legal documents," even though he had only a ninth-grade education. According to Alkam, who said that he identified Mike by his passport picture, Mike dictated the terms of his will in Arabic, and Alkam wrote out the terms by hand. Mike then read the handwritten will (using a magnifier) and signed it in Arabic, as did Hatem and Hani, who signed as witnesses. Next, Mike asked that the will be typewritten. Alkam took the handwritten version to a typist, and when he returned with the typewritten will, Mike read it (using a magnifier) and signed it in Arabic, as did Hatem and Hani, who signed as witnesses. Alkam then gave the handwritten will and the typed will to Mike. Thereafter, according to Hani, Mike threw the handwritten will away and retained the typewritten will. The typewritten version would later be offered as a lost will.

An English translation of the typed will shows it to be rather unusual by Western standards. It is made "In The Name of Allah Most Gracious Most Merciful," and it makes no precise bequest of money or property to any person. Instead, it provides for "the amount of money and property I have specified for my three sisters (and a Share for my family) according to the Islamic law of Allah

---

[1] Because the decedent and many of the his family members bear the surname "Abdin," we will use first names in this opinion to prevent confusion.

and His Messenger," with the "biggest share" going to "my sister Hala." It also contains several provisions stating that the testator "would like" for the following to occur: 1) Wael to invest Hala's share for her; 2) Wael to buy a house and "make it an Islamic trust," to be leased, with the proceeds going to his other sisters; 3) "you to build a Mosque" in Jerusalem named after Mike; 4) Wael to send someone to perform the Hajj obligation on behalf of Mike and his mother; 5) his brothers and sisters to buy a new store for his younger brother, Muhannad. Finally, the will states that the testator had:

> left some signed checks with my brother Hani, so you may make use of them after I pass away. But you should wait until you talk with my wife Dolaris [sic] or Kathi [apparently Cathy Miller, the manager of the Arkansas jewelry store] to sell some of the property and deposit the money in the account. Or if you want to transfer the ownership from my name to your name and then you sell it; Kathi knows all the brokers that I deal with in real estate and she is good and helpful lady.

> From the family share, I would like you to build a DeWan (Hall or a Family Center) and to name it after my father's name. . . .

The will leaves nothing to Mike's wife and daughters and mentions them by saying, "I would like that all of you have [sic] good relationship with my wife and with my daughter[s]."

Mike returned to Arkansas after his trip to Israel, and his health began to decline further. He was hospitalized and eventually died on March 15, 2000, leaving a substantial estate valued in the millions of dollars. On April 3, 2000, his wife Delores petitioned the Pulaski County Circuit Court to probate a will that Mike had executed in 1984. The will named Delores as Executrix and, except for a specific piece of property that was left to the daughter of Mike's business associate, Cathy Miller, bequeathed all of Mike's property to Delores. The will further provided that, should Delores predecease him, his estate should be left in trust to his two daughters. The circuit judge admitted the will to probate.

The purported lost will, in its typewritten form, was alleg-edly located in Israel forty days after Mike's death. According to Hani and Hatem, they entered the room where Mike had stayed at Hatem's home and discovered an envelope containing several of Mike's signed blank checks and the original typewritten will that

Mike had executed in January 2000. Copies of the will were made and sent to the United States, although to whom is not clear. Hani later visited an Israeli attorney, Nabil Gheith, and asked Gheith to send the original of the will to Wael's Arkansas attorney, Richard Hatfield. However, according to Gheith, the original was lost in the mail.

Due to the loss of the original document, Wael filed a petition in the Pulaski County on November 13, 2000, seeking to probate the Israeli will as a lost will. A photocopy of the purported will and an English translation of it were attached to the petition. On July 20 and 21, 2004, Judge Alice Gray held a hearing on the matter. Thereafter, she denied admission of the Israeli will to probate, ruling that Wael failed to prove that Mike had signed the will and further that, even if Mike's execution of the will had been proven, Mike had the opportunity to destroy the will in his lifetime. Wael now appeals and argues that the trial court clearly erred in ruling 1) that Mike did not sign the Israeli will, and 2) that Mike had the opportunity to destroy the will in his lifetime.

Probate cases are reviewed de novo, but we will not reverse the probate judge's findings of fact unless they are clearly erroneous. *Remington v. Roberson*, 81 Ark. App. 36, 98 S.W.3d 44 (2003). A finding is clearly erroneous when, although there is evidence to support it, we are left on the entire evidence with the firm conviction that a mistake has been committed. *Id.* Due deference will be given to the superior position of the trial judge to determine the credibility of the witnesses and the weight to be accorded their testimony. *Id.*

The admission of lost wills to probate is governed by Ark. Code Ann. § 28-40-302 (Repl. 2004), which reads as follows:

> No will of any testator shall be allowed to be proved as a lost or destroyed will unless:
>
> (1) The provisions are clearly and distinctly proved by at least two (2) witnesses, a correct copy or draft being deemed equivalent to one (1) witness; and
>
> (2) The will is:
>
> (A) Proved to have been in existence at the time of the death of the testator; or
>
> (B) Shown to have been fraudulently destroyed in the lifetime of the testator.

Under this statute, the proponent of a lost will must prove two things. First, he must prove the will's execution and its contents by strong, cogent, and convincing evidence. *Conkle v. Walker*, 294 Ark. 222, 742 S.W.2d 892 (1988); *Matheny v. Heirs of Oldfield*, 72 Ark. App. 46, 32 S.W.3d 491 (2000). Second, he must prove that the will was still in existence at the time of the testator's death (*i.e.*, had not been revoked by the testator) or that it was fraudulently destroyed during the testator's lifetime. Proof of this second element is necessary because the law presumes that an original will that cannot be found after a testator's death has been revoked. *See Tucker v. Stacy*, 272 Ark. 475, 616 S.W.2d 473 (1981); *see also Remington, supra*; *Gilbert v. Gilbert*, 47 Ark. App. 37, 883 S.W.2d 859 (1994). It is the failure to produce the original will that gives rise to the presumption. *See Remington, supra.* This presumption may be overcome, however, if the proponent of the lost will proves, by a preponderance of the evidence, that the will was not revoked during the testator's lifetime. *See Remington, supra; Gilbert, supra.*

We first address Wael's argument that the trial court clearly erred in ruling that he did not prove that Mike had executed the lost will.He cites several factors that he contends should lead us to conclude that Mike signed the will, including: 1) that the only direct testimony regarding the signature came from Khaled Alkam (the clerk), Hani, and Hatem, all of whom said that they saw Mike sign the will; 2) that Wael and Ziad, who were very familiar with the Arabic language and Mike's signature, identified his signature on the will; 3) that the estate's expert document examiner, Linda Taylor, who testified that she could not identify the signature as Mike's, did not consider the effect that Mike's age and illness might have had on his signature, nor did she have any experience analyzing Arabic signatures; 4) that the evidence is undisputed that Mike had a history of sending money to his family; 5) that the Koran allows a Muslim to dispose of one-third of his estate in any way he chooses, which the Israeli will would comply with, once Mike's jointly-held property and Delores's dower interest were deducted from his estate.

Despite the above listed factors, our review of the record, as abstracted, shows that there was conflicting evidence on the issue of whether Mike signed the Israeli will. Wael testified that, while Mike was in Jerusalem, Mike called him and told him that he "took care of the will." Ziad testified that, after Mike returned from Jerusalem, he told Ziad that he "did all of the

paperwork to take care of my sisters and her kids [sic] and my younger brother." Both men also identified the Arabic signature on the Israeli will as Mike's. Further, they testified that Mike regularly sent money to his Israeli relatives and often left blank checks in Jerusalem. Ziad said that, just before Mike went to Jerusalem, Mike told him that:

> I did leave some checks in Jerusalem. If ever something happened to me, I got some checks, and there could be — these checks will be distributed to some of my sisters and my brother from real estate he had here in the states, and he said I don't have the money in the bank, but I have the real estate. You can use some of this money to help, you know, my sisters and my brother, my younger brother, and [Mike] wanted to do something for building like some kind of mosque or like a hall for the family, and [Mike] said that's — [Mike] left some of these checks in Jerusalem to be used after [Mike's] death.

Mike's brothers Hani and Hatem also testified that Mike had signed the will. The clerk who drafted the Israeli will, Khaled Alkam, stated that he identified Mike by his passport and drafted the will as Mike requested. Additionally, Wael's document examiner, Curtis Baggett, testified that the Arabic signature on the Israeli will was Mike's. Imam Islam Musad of the Islamic Center in Little Rock explained that there is an obligation under the Koran for males to take care of females; that the Koran provides for fixed shares for certain relatives; and that a person has the flexibility to dispose of one-third of his assets as he wishes.

However, the proof presented by the estate contradicted much of the above evidence. Delores and Cathy Miller, who had managed Mike's jewelry store for twenty-six years, testified unequivocally that the signature on the will was not Mike's. Despite Wael's claims that these women were not familiar with the Arabic language, Delores said that she had seen Mike's Arabic signature fifteen to twenty times, and Miller said that she had seen it "possibly a dozen times." Furthermore, each witness, in testifying that the signature on the will was not Mike's, offered an explanation that did not depend on a knowledge of the Arabic language. Delores said that the signature on the will was small and neat, whereas Mike "couldn't write like that. He would write real big and you could hardly read it." Miller said that Mike "couldn't see to write in a space that small for one thing. It is so level on the line.

It's just not possible that he could write on a straight line. It's a hundred percent not possible." Both women additionally testified that it would be unlike Mike not to make a provision for his daughters, who Delores testified were "his life." Moreover, according to Delores, Mike had never mentioned drafting a will while he was in Israel.

Delores and Cathy Miller also offered testimony tending to discredit Wael and Ziad. Delores said that Mike did not trust Wael because of Wael's gambling. Miller stated that, while Mike was dying in the hospital, Wael mentioned several times that he needed money, possibly $30,000, and implored Mike, on his deathbed, "Mike, tell Cathy to give me the money for the mosque." There was also evidence that Wael or Ziad may have countenanced the misuse of some of the signed blank checks that Mike left in Israel for his family's caretaking. After Mike's death, his siblings in Israel filled out seven of the checks in the amount of $200,000 each and one check in the amount of $300,000, and named themselves as payees. Later, in a petition filed by Ziad, they made a claim against the estate based on the checks. The claim was later withdrawn in 2004 when it was determined that the checks "were not valid" under Arkansas law. Wael and Ziad explained that the checks were written after their efforts to resolve the situation with Delores proved unsuccessful.

The estate also called Linda Taylor, a certified document examiner, who testified that she could not identify Mike as the signer of the will. Finally, there was testimony from Mike's long-time friend, business associate, and attorney, Mike Wilson, who said that he prepared Mike's 1984 will and that he and Mike had discussed the tax implications of his estate many times since. He said that he did not believe that Mike would make a new will without his knowledge.

Given the above evidence, we cannot say that the trial court clearly erred in ruling that Wael failed to prove that Mike executed the Israeli will. Wael's arguments are, for the most part, attacks on the credibility of the estate's witnesses. He claims that his witnesses, who said that they actually saw Mike signing the purported lost will, were more believable than the estate's witnesses. However, it was within the trial judge's purview to believe Delores Abdin and Cathy Miller, who had known Mike for many years and who testified unequivocally that the signature on the will was not his. *See generally Hanna v. Magee,* 189 Ark. 330, 72 S.W.2d 237 (1934) (holding that circumstantial evidence that a will was never

executed may outweigh testimony of witnesses who allegedly witnessed the will). Moreover, even though, as Wael claims, Delores Abdin and Cathy Miller had an interest in the outcome of the case, many of Wael's witnesses were interested as well, in that their family would benefit from the probate of the Israeli will. Where the decision turns on the credibility of interested witnesses, we defer to the superior position of the trial court to judge their credibility. *See Brown v. Brown*, 76 Ark. App. 494, 68 S.W.3d 316 (2002).

Wael's attack on the testimony of the estate's expert, Linda Taylor, is likewise a credibility matter. He claims that she failed to take Mike's age and illness into consideration in analyzing the signature on the will. However, Taylor testified that, even considering those factors, she would expect to see "different characteristics than what I was seeing in the questioned signature" and that she did "not believe it was possible" that the person who signed the known signature samples also signed the will. Wael also claims that Taylor had no background in analyzing Arabic signatures. However, Taylor's qualifications as a document examiner were formidable. She had worked for the FBI and the Arkansas Crime Lab, where she was the chief examiner of questioned documents; was board-certified since 1990; had a certificate from the Arkansas Commission on Law Enforcement Training; and had published articles in peer-review journals. By contrast, Wael's expert, Baggett, admitted that he was not board-certified. He testified that he had studied under Dr. Ray Walker, who was a doctor of divinity. He also said that he taught document examination through Handwriting University, a mail-order school, and that his son owned HandwritingUniversity.com, the "largest handwriting analysis school in the world." He admitted that he had taken no continuing education classes, had never published in any trade journals, and that he had once been convicted of felony theft. Thus, it is ultimately the credibility of the expert witnesses that is at issue, and, on such questions, we defer to the trial judge. *See Skokos v. Skokos*, 344 Ark. 420, 40 S.W.3d 768 (2001) (holding that a trial judge's determination that one expert's testimony was entitled to more weight and credibility than the other expert's was within the scope of the judge's discretion).

Finally, while Wael argues that the Israeli will was consistent with Islamic law, even if such a consistency exists, there was evidence that the will was inconsistent with Mike's great affection for his daughters, who were not provided for at all in the Israeli

will. Moreover, both Delores and Cathy Miller testified that the Israeli will did not "sound like" Mike.

It was Wael's burden to prove by strong, cogent, and convincing evidence that Mike executed the Israeli will. *See Matheny, supra.* Considering the evidence in this case as a whole, we cannot say that the trial judge clearly erred in ruling that Wael did not meet his burden. We therefore find no error on this point.

In light of our holding that Wael failed to prove the execution of the Israeli will, it is not necessary for us to resolve the issue of whether the trial court erred in ruling that Mike had the opportunity to destroy the will during his lifetime. However, we note that there is no evidence that Mike had actual possession of the will or access to it after he returned to the United States. No one saw the will in his possession, and he never mentioned having custody of it. There is, in fact, considerable evidence that the purported will remained in Jerusalem. Nevertheless, Wael's prevailing on this point is inconsequential, given our ruling regarding the execution of the will. *See Thomas v. Thomas,* 30 Ark. App. 152, 784 S.W.2d 173 (1990); *Wharton v. Moss,* 267 Ark. 723, 594 S.W.2d 856 (Ark. App. 1979) (holding that the proponent of a lost will must prove *both* the execution of the will the lack of revocation or fraudulent destruction).

We conclude by mentioning an evidentiary argument that Wael makes for the first time in his reply brief. During the testimony of expert witness Linda Taylor, she stated that her opinion had been reviewed by another document examiner, Mr. Bear Chandler. Wael objected on the ground of hearsay, but the trial court overruled the objection. Wael argues that the trial judge erred in permitting the testimony.

It is well established that we will not consider an argument made for the first time in a reply brief. *See Maddox v. City of Fort Smith,* 346 Ark. 209, 56 S.W.3d 375 (2001). However, there is an unusual circumstance in this case. Prior to his reply brief's being filed, Wael filed a motion asking for permission to "supplement the record." He claimed that his objections to Taylor's testimony did not "appear in the abstract," and he submitted two pages of supplemental abstract containing that material. We granted the motion to supplement. However, Wael's motion did not make it clear that he would be raising an argument regarding this testimony for the first time in his reply brief. He did not seek permission to raise a new argument but only to supplement his

abstract. Under these circumstances, he remains bound by the general rule that we do not consider arguments raised for the first time in a reply brief.

Affirmed.

HART and BAKER, JJ., agree.