

# ARKANSAS COURT OF APPEALS

DIVISION IV
No.  CV–13–347

| | | |
|---|---|---|
| TODD WHATLEY<br>APPELLANT | | **Opinion Delivered** December 4, 2013 |
| V. | | APPEAL FROM THE UNION COUNTY CIRCUIT COURT<br>[NO. PR–2011–78–6] |
| ESTATE OF BETTYE L. MCDOUGAL and ALBERT WARREN<br>APPELLEES | | HONORABLE DAVID F. GUTHRIE, JUDGE |
| | | AFFIRMED |

## RITA W. GRUBER, Judge

Bettye McDougal died at home on February 17, 2011, at age sixty-four. She had become unable to leave her recliner or bed in her final days, was under the care of hospice, received visits from a home health-care nurse, and was constantly cared for by close friends and relatives. The Circuit Court of Union County admitted to probate a copy of an April 6, 2007 will proffered on March 21, 2011, by her brother, Bobby Long, as her last will and testament. The will nominated Mr. Long as executor; left the bulk of the estate to him; excluded Ms. McDougal's only child and intestate beneficiary, Todd Whatley; and made specific bequests to friends including Albert Warren, who had lived with her for twelve years, as well as to a trust for her two grandchildren.

Mr. Whatley objected to probation of the copy of the will, stating that the original had not been located and that he believed his mother had intentionally destroyed it before her death. He asked the court to find that she died intestate and—because Mr. Long had a

conflict of interest with the estate—to appoint a different executor. At trial—conducted on February 6 and June 11, 2012—Mr. Whatley stipulated that his mother properly executed a will on April 6, 2007, at the office of her lawyer. The parties did not dispute that Ms. McDougal left the lawyer's office with the original will and that it was not found after her death.

Much of the testimony at trial focused on decedent's strong-willed personality and business acumen; on knowing what she wanted; on her fifteen-year strained relationship with her son; and on the fact that she often publicized her intention to cut him out of her will. Her estrangement with him began after his wife, Regina Whatley, stole money from decedent's trucking business and his relationship with his wife continued despite decedent's wishes. From then on, neither Todd Whatley nor his and Regina's young son visited decedent again until the week before her death. She began spending all holidays with her brother and his wife, Janice Long, and never had a visit with her second grandchild, who was born after the estrangement began.

In its written order, the court deemed the testimony of decedent's brother and his wife and of decedent's friends Horace "Hermie" McAlister, Meredith Bastien, Terry Graves, and Jimmy Lou Bates to be credible and persuasive for the estate. It found that decedent strongly felt she had been wronged by her daughter-in-law and son and that she cut them out of her estate in retaliation. The court discussed decedent's physical condition as a factor in her inability to access either a safe in a downstairs closet, where she kept papers and valuable property and which could not be reached without kneeling and crawling, or her upstairs

2

SLIP OPINION

office, where an empty envelope that had contained her will was found. The court found that the inaccessibility of these places—particularly by the time decedent had round-the-clock care and in her final six days of life after her son's visit—argued against her revocation of her will by destruction. Based on these findings, the court concluded that the estate had satisfied the statutory requirements of Arkansas Code Annotated section 28-40-302 and had sufficiently rebutted the presumption of revocation by destruction. The original will was therefore found to have been in existence at the time of her death and to have been lost or misplaced. The court declined to appoint Mr. Long as executor and instead appointed Simmons First Bank of El Dorado, a neutral third party.

Mr. Whatley appeals, contending that the circuit court clearly erred in admitting the copy of the will to probate. He contends that the proponent of the will, Mr. Long, failed to present any evidence that the original will was in existence at the time of the testator's death, as is required by statute.

Arkansas Code Annotated section 28-40-302 (Repl. 2012) states that no will of a testator shall be allowed to be proved as a lost or destroyed will unless

(1) The provisions are clearly and distinctly proved by at least two (2) witnesses, a correct copy or draft being deemed equivalent to one (1) witness; and

(2) The will is:

(A) Proved to have been in existence at the time of the death of the testator; or

(B) Shown to have been fraudulently destroyed in the lifetime of the testator.

Under this statute, the proponent of a lost will must prove two things: first, the will's

SLIP OPINION

execution and its contents by strong, cogent, and convincing evidence; second, that the will was still in existence at the time of the testator's death (i.e., had not been revoked by the testator) or was fraudulently destroyed during the testator's lifetime. *Abdin v. Abdin*, 94 Ark. App. 12, 223 S.W.3d 60 (2006). Proof of the second statutory element is necessary because the law presumes that an original will that cannot be found after a testator's death has been revoked. *Id.* It is the failure to produce the original will that gives rise to the presumption; the presumption may be overcome if the proponent of the lost will proves, by a preponderance of the evidence, that the will was not revoked during the testator's lifetime. *Id.*

It will be presumed that a testator destroyed a will executed by the testator in his or her lifetime, with the intention of revoking same, if he or she retained custody thereof or had access thereto, and it could not be found after the testator's death. *Wharton v. Moss*, 267 Ark. 723, 594 S.W.2d 856 (Ark. App. 1979); *Rose v. Hunnicutt*, 166 Ark. 134, 265 S.W. 651 (1924). The burden is upon the proponent of the will to prove by a preponderance of the evidence that the decedent did not revoke it during his or her lifetime. *Thomas v. Thomas*, 30 Ark. App. 152, 784 S.W.2d 173 (1990). Thus, it is not necessary for the trial court to determine what became of the will; it is enough that the court determine that the will was not revoked or cancelled by the decedent. *Id.*

Probate cases are reviewed de novo, but we will not reverse the probate judge's findings of fact unless they are clearly erroneous. *Remington v. Roberson*, 81 Ark. App. 36, 98 S.W.3d 44 (2003). A finding is clearly erroneous when, although there is evidence to support

4

SLIP OPINION

it, we are left on the entire evidence with the firm conviction that a mistake has been committed. *Id.* Due deference is given to the superior position of the trial judge to determine the credibility of the witnesses and the weight to be accorded their testimony. *Id.*

In the present case, the circuit court found that the second prong of the statute was established by indirect evidence that the original will was in existence at the time of decedent's death. Decedent's safe was secured by both a key and a combination lock, and it was accessible only by her or someone at her direction. Albert Warren knew how to access the safe and had done so before at her direction; Bobby Long knew the location of the key, but decedent kept the combination to the safe. Todd Whatley visited her only the one time after their estrangement, was never alone with her, and was never alone in the house. Family and friends who were periodically alone with her in her last days were the beneficiaries under the will. Decedent had told them that all the papers for her estate were in the safe; other documents were found in there, but not the will. Decedent kept valuables in odd places, Albert Warren had the onset of dementia during her last year, and no one made a thorough and exhaustive search of the house.

Mr. Whatley argues that the circuit court clearly erred in admitting to probate the copy of his mother's April 6, 2007 will because the will's proponent failed to present any evidence that the original was in existence at her death or any time after being delivered to her shortly after it was executed. He asserts that the only witnesses who testified to seeing the will were Joe Hickey—the attorney who prepared it—and his employee who witnessed its execution. Mr. Whatley argues that because there was no evidence that the original will was in existence

at the time of his mother's death, there was no rebuttal of the presumption that her original will—known to have been in her custody and not found after her death—was destroyed by her with the intent to revoke it. He asserts that there was ample testimony that his mother put her affairs in order when she knew the end was near: she directed her funeral plans, the writing of her obituary, the delivery of jewelry for safekeeping and of cash for payment of final expenses, and the removal of important papers from her safe and refrigerator; and she rationed her pain medication so that she could remain clear-headed. Mr. Whatley notes that when he and his son visited decedent shortly before her death, she discussed buying vehicles for her grandchildren, a provision not found in the trust or the will, and she was wondering if she had delayed her grandchildren's receipt of benefits from the trust. He asserts that "in spite of the strained relationship, it was undisputed that she loved her son and grandchildren."

Mr. Whatley argues that none of Mr. Long's witnesses—although testifying that decedent did not want to make changes after Mr. Whatley's visit—testified that they had seen the original will and knew it to be in existence at the time she denied wanting any changes. He asserts that decedent's statements—that everything was taken care of and she had no need or desire to make changes—are as consistent with her having destroyed the will to revoke it years ago as they are to indicate that it was in existence at the time of her death. He argues that those statements, taken with decedent's continuing to give directions to people around her in her last days but not giving direction to the location of the will, actually tend to show that the will was no longer in existence. He asserts that testimony of decedent's being physically incapable of reaching her safe or upstairs office in her final days was also insufficient

to demonstrate that the will was in existence at the time of her death because it is unaccompanied by evidence that the will was actually in either of those places.

Joe Hickey testified at trial that decedent brought to his office in 2007 a paper in her handwriting, which she said was her will. It was dated February 26, 2007, and specified how she wanted her estate divided. In this holographic will, she left her son "all the love that I was not allowed to give you and $100.00" for choosing not to speak to her over a wrong done by his wife. She wrote that she had told several friends her wishes and that she hoped her son would not "try to break this and take more of my money from me. I think you and your wife have taken more than your share." The will was not signed.

Mr. Hickey prepared decedent's April 6, 2007 will along with a 2007 Bettye McDougal Trust Agreement. This trust created the Bettye McDougal Grandchildren's Trust and ordered that $200,000 be distributed to it upon her death, specifying that "under no circumstances shall any payment or distribution ever be made to Billy Todd Whatley or [his wife] Regina Whatley." Decedent told Mr. Hickey that she wanted her brother to be the executor because "he knows what I want and he'll do it right." She also wanted her brother to be trustee but did not want him "to have too much problem with it." She chose a corporate institution because she wanted the money "tied up for a long time for the grandchildren." The trust instrument provided that if the corporate trustee was not acting satisfactorily for her grandchildren's benefit in her brother's estimation, he could fire the corporate trustee and name another. Mr. Hickey recalled that decedent told him she was leaving her son out because his wife had taken money from her and he had sided with his

wife, and afterward there was a falling out that resulted in very little contact and decedent's not being allowed to see her grandchildren. Decedent wanted money to be held in trust for her grandchildren until the time when they could control the money and not be subject to possibly their mother controlling it.

Mr. Hickey's office made photocopies for his file after decedent signed the original trust and will, which she took with her when she left. He kept the original of a first amendment and restatement of the Bettye McDougal 2007 Trust, which decedent dated and signed on April 3, 2009, and which again did not include her son. After decedent knew that she had cancer, Mr. Hickey prepared an August 11, 2010 durable power for health care that appointed her brother as agent, which she signed in Mr. Hickey's office. He also prepared a durable power of attorney signed by her on January 31, 2011, appointing her brother.

Janice Long, decedent's sister-in-law, testified that she and her husband (Bobby Long) never found decedent's original will and that she believed it had been lost. She testified that Mr. Warren thought the will was in the safe and that she and her husband thought it would be either in the safe or the office—where they had found the trust instrument. She found an empty envelope that she thought might have had a will in it; when she took it to Joe Hickey's office, he told her it was not the envelope in which he put the will.

Terry Graves, a friend whom decedent trained as a real-estate appraiser, was aware from at least 2004 until decedent's death of the difficult relationship with her son. Ms. Graves witnessed that he would not acknowledge his mother or speak to her at realtors' meetings, Christmas parties, and business functions. Ms. Graves went to Mr. Whatley's office when she

first began working and expressed her viewpoint that he and decedent needed to "sit down and talk it out." He told Ms. Graves his side of the story.

Ms. Graves went with decedent numerous times to see a wellness doctor in Missouri, went with her for hospitalization, and was with her when exploratory surgery revealed ovarian cancer. Because Mr. Warren was not always reliable, decedent relied on Ms. Graves and Jimmy Lou Bates. Ms. Graves kept notes of phone calls to doctors and of medication times and doses. She repeatedly told doctors that decedent would break out in a cold sweat, "start talking delirious off the top of her head," and "see things" when she took morphine. After a reaction on August 3, 2010, decedent had her attorney draw up a durable power of attorney so that no one would ever again give her morphine or put a gastric tube down her throat. Ms. Graves testified that decedent trusted Bobby and that "she wanted power of attorney for him in her estate, her medical records, everything. They were close."

Beginning in August, decedent discussed with Ms. Graves what she wanted to happen when she died—she dictated her obituary and discussed funeral arrangements. Decedent's feeling toward her son had not changed in February, the day after he came to see her. She told Ms. Graves that he had come because she was sick and to save face after not coming for fifteen years; Ms. Graves replied that she had told him he needed to come and had talked to him by telephone. Decedent did not discuss details of her will, but she told Ms. Graves that she had not left her son anything. She said that she left each grandchild $100,000: they were to get half the amount at age thirty and the other half at thirty-five, when they would be on their own and their parents could not get their hands on it. She felt that she and her son still

had a relationship, but she wanted nothing to do with him because he had chosen his wife over her. Decedent told Ms. Graves that the estate was "all handled, the lawyer has got it all." Ms. Graves assumed that the important paperwork was in Mr. Hickey's office or decedent's safe.

Ms. Graves brought decedent home from the hospital for the last time on February 3, 2011, and she was never left alone until her death. The primary caregivers were Ms. Graves, Jimmy Lou Bates, and Albert Warren, with Bobby and Janice Long "in and out" all the time and Hermie McAlister coming to check on his friend. Ms. Graves said that Mr. Long and Mr. McAlister could be called when anything was needed.

Meredith Bastien, a friend who shared decedent's interest in alternative medicine, testified that decedent talked often about dying and was open with everyone about cutting her son out of her will. Ms. Bastien relayed decedent's feeling that Regina Whatley stole money from her the night decedent's husband died, decedent's saying many times that Ms. Whatley would not get a penny, and decedent's wanting almost everything to go to her grandchildren because she felt she had been robbed of their lives during her life. Ms. Bastien described decedent as a strong-willed and resolute person who took care of business. Decedent told her toward the end of the last month of life that everything was in order and, within Ms. Bastien's knowledge, never changed her mind about what she wanted done with her estate. Ms. Bastien was surprised to learn that the will was missing and testified that she would be shocked to learn that decedent had left her son anything.

Hermie McAlister, decedent's neighbor, testified that they had been friends for years

and that he saw her at least every other day before she died. She mentioned in the last few weeks of life what she wanted to happen with her estate—eventually saying that she wanted her grandchildren to get it, that she had a will, and that what she wanted done was "all mapped out." On Saturday before her death, she was excited that her grandson had been there, and she told Mr. McAlister that they had a good time talking about cooking, fishing, and what they "could have done." Her son had also been there; Mr. McAlister asked her if that had changed anything, and she said "no." Mr. McAlister was there again on Sunday when decedent was not doing nearly as well, and they had no more conversation about her estate or will.

Jimmy Lou Bates, decedent's hairdresser and friend of forty-two years, did not personally know Ms. Graves until the two women stayed with decedent in the hospital through illnesses and surgeries. Decedent discussed with Ms. Bates on numerous occasions her relationship with Todd Whatley, saying that she did not want him to have a thing and wanted her grandchildren "to have what was left of her estate[.]" She told Ms. Bates that "everything was fixed" the way decedent wanted it and "the paperwork was in the safe." In her last week, decedent kept telling Ms. Bates, Mr. and Ms. Long, and whoever was around that everything they would need was in the safe and that everything was handled. Ms. Bates asked after Mr. Whatley's visit if any changes needed to be made and if the lawyer should be called; decedent replied, "Nope." Until her last three days, when she became unable to speak, she kept telling Ms. Bates that everything was in the safe. She never told Ms. Bates that she had destroyed the will.

SLIP OPINION

In *Garrett v. Butler*, 229 Ark. 653, 317 S.W.2d 283 (1958), Butler petitioned the probate court for restoration of a lost will in which decedent devised a large portion of his estate to Butler. A carbon copy of the will was introduced into evidence. There was proof that the will, written by decedent's attorney, was properly executed and witnessed; that decedent had good reasons for making Butler his chief beneficiary; that nothing occurred to change or alter those reasons; and that decedent indicated to a disinterested witness shortly before his death that he expected Butler to have some control over his affairs after his death. There was a total absence of any testimony that decedent tried or wanted to make any changes or revoke his will, and there was opportunity during his last illness for people including his brother, an interested party who did not testify, to handle and destroy or misplace the will. Our supreme court wrote:

> As was said in [*Bradway v. Thompson*, 139 Ark. 542, 214 S.W. 27, 33], in speaking of the problem facing the trial judge in this kind of a case: "It was not indispensable that he should determine what became of the will. It was enough that he should find that it was not revoked or cancelled by the testator."

*Garrett*, 229 Ark. at 657, 317 S.W.2d at 285; *see Thomas*, 30 Ark. App. 152, 784 S.W.2d 173. The *Garrett* court concluded that the testimony and attending circumstances were sufficient to overcome the presumption that decedent's will had been revoked.

In the present case, as in *Garrett*, the testimony and attending circumstances were sufficient to overcome the presumption of revocation. It was up to the circuit court to determine the credibility of the witnesses and the weight to be accorded their testimony. There was ample evidence that decedent was determined that her son inherit nothing upon her death; that she believed, and told many people, that her plans for distribution of her estate

12

were taken care of; and that she, as well as relatives and friends attending her in her final days, believed the necessary papers were in her safe or her attorney's office. This evidence argues against revocation or destruction of the will that insured her plan would be carried out, and it supports a conclusion that the will was in existence at the time of her death. It was not necessary that the circuit court determine what happened to decedent's original will; it was enough that the court found that the will was not revoked or cancelled by her.

Affirmed.

GLADWIN, C.J., and WALMSLEY, J., agree.

*Bell & Boyd, P.A.*, by: *Michael W. Boyd* and *Karen Talbot Gean*, for appellant.

*Mary Thomason* and *Ronald L. Griggs*, for appellees.